LESTER BROTHERS, INC., PLAINTIFF v. J. M. THOMPSON COMPANY, DEFENDANT.

(Filed 31 January 1964.)

**1. Contracts § 12—**

The contract of the parties must be enforced as written, and where the language is free from ambiguity the court must declare its meaning as a matter of law.

**2. Same—**

Where a contract calls for the delivery of wood trusses completely assembled at the job site for a specified sum, the term "completely assembled" has a definite meaning, and while the manufacturer may be free to assemble the

trusses at its plant or to assemble them for shipment at its plant and complete the assembly at the job site, the delivery to the purchaser in such condition as to require appreciable labor to complete the assembly fails to meet the specifications of the contract.

### 3. Customs and Usages—

When properly pleaded, a local custom or one peculiar to a particular trade or business may be shown in evidence for the purpose of clarifying ambiguous words of the contract, but evidence of customs and usages is incompetent to vary or contradict the terms of a written agreement which is free from ambiguity.

### 4. Same—

Where the categorical terms of the contract require the manufacturer to complete the assembly of the trusses either at its plant or, after shipment, on the job site, the admission of evidence of the manufacturer's contention that the trusses were assembled for shipment in the customary manner is incompetent and irrelevant, since it tends to vary the terms of the writing requiring complete assembly and not merely assembly for shipment.

### 5. Trial § 42—

The verdict must be interpreted with reference to the pleadings, the evidence and the judge's charge.

### 6. Trial § 33—

Where the terms of the contract are unambiguous, whether facts established by uncontradicted evidence constitute a breach of such contract is a question of law, and the party asserting such breach is entitled to an explicit instruction to this effect.

### 7. Same—

Where the court charges the circumstances under which the jury should answer the issue "no" but fails to charge the circumstances, arising upon the evidence, under which the jury should answer the issue in the affirmative, the charge must be held for prejudicial error, since it is the duty of the court to charge the jury on all substantial features of the case arising on the evidence. G.S. 1-180.

### 8. Appeal and Error § 45—

The admission of incompetent evidence tending to establish the absence of a breach of the contract in one aspect cannot be held cured by an affirmative verdict upon the issue when the adverse party has introduced evidence tending to establish a breach in two separate aspects, so that the issue might have been answered in the affirmative on the other aspect, and the incompetent evidence, in connection with the charge, might have affected the amount of damages awarded.

### 9. Contracts § 21—

Evidence tending to show that the builder had its crew ready to handle trusses at the time of delivery by the manufacturer, that the trusses were too short, that the defect was not discovered until the crew had installed

some of them, that the trusses installed had to be taken down, so that the crew lost time before it could be put back to work on some other job, *is held* sufficient to be submitted to the jury on the issue of damages from the delivery of trusses failing to meet the specifications, even though the defective trusses were later replaced.

APPEAL by defendant from *Williams, J.,* January 1963 Regular Civil Session of WAKE.

On or about February 11, 1958, plaintiff, a Virginia corporation with principal office in Martinsville, Virginia, and defendant, a North Carolina corporation with principal office in Raleigh, North Carolina, entered into a written contract for the sale by plaintiff and the purchase by defendant of "2598 Typical wood trusses completely assembled per plans and specifications F.O.B. job site for the sum of $32,000.00." The trusses were for use by defendant in roof construction work on the thirty-eight buildings comprising FHA Project "NC 2-5, Walnut Terrace, Raleigh, North Carolina."

Plaintiff, alleging full performance, instituted this action to recover $7,100.00, the unpaid portion of said contract price of $32,000.00. (Note: Through inadvertence, plaintiff alleged the contract price was $32,003.00.)

Answering, defendant admitted that plaintiff, on dates between August 5, 1958, and March 7, 1959, had delivered 2598 trusses to defendant at the Walnut Terrace Housing Project site in Raleigh. It admitted the amount it had paid plaintiff was $24,903.00. It denied that it was indebted to plaintiff in any amount.

Defendant, for further answer and defense, alleged: The 2598 trusses, when delivered by plaintiff to defendant, "were not completely assembled as called for in the proposal submitted by plaintiff and accepted by defendant." It was necessary to unload the trusses from plaintiff's trucks and assemble them before they were ready for installation in the buildings. Plaintiff's men at plaintiff's expense "completely assembled 210 of the trusses on the job site." The remaining 2388 trusses had to be and were "completely assembled" by defendant at a cost to it of $2.29 per truss for a total of $5,468.52. In addition, "some 300 of the trusses delivered by plaintiff to defendant had not been properly put together" in certain respects; and defendant, to correct the deficiencies, incurred costs and expenses in the amount of $479.03. Hence, defendant was entitled to a credit of $5,947.55 "against the difference in the contract price and the amount paid thereon by defendant to plaintiff."

Defendant, for a counterclaim, alleged "the progress of the work was delayed and the labor costs to the defendant were substantially increased, all as a direct result of the failure of the plaintiff to deliver trusses

manufactured in conformity with the plans and specifications and the approved shop drawings and completely assembled as required by the plaintiff's contract with the defendant," and on account thereof defendant sustained damages in the amount of $8,400.00.

Defendant prayed (1) that plaintiff recover nothing, (2) that defendant recover from plaintiff the sum of $7,250.55 and (3) that plaintiff be taxed with the costs. (Note: Defendant arrives at the figure of $7,250.55 by deducting $7,097.00 from $14,347.55, to wit, $5,947.55 plus $8,400.00.)

In its reply to defendant's further answer and defense, plaintiff admitted "that it assisted the defendant by showing the defendant's agents and employees the best method for installing the trusses furnished by the plaintiff fully assembled as required by the plans and specifications." In its reply to defendant's counterclaim, plaintiff admitted "that before the trusses could be erected on the buildings it was necessary that a center bolt be placed therein." Plaintiff *denied* "this was not in complete accordance with the plans and specifications and that the trusses were not fully assembled in accordance with the correct interpretations of that term as the same is universally used in the building trades and an accepted practice and as the said term is universally and legally defined." Plaintiff admitted it sent a representative and a crew of its men to the job site who, plaintiff alleged, "discovered that the trusses had been mishandled and improperly cared for by the defendant after delivery on the job, and that due to deterioration by the elements the defendant had permitted some of the trusses to become defective after delivery." Except as stated, plaintiff denied all allegations on which defendant based its further defense and counterclaim.

Plaintiff prayed (1) that defendant recover nothing on its counterclaim, and (2) that plaintiff recover ($7,100.00 plus interest and costs) in accordance with the prayer in its complaint.

Evidence was offered by plaintiff and by defendant.

At the close of defendant's evidence, the court granted plaintiff's motion for nonsuit of defendant's alleged counterclaim. Defendant excepted.

The court submitted and the jury answered the following issues: "1. Did the plaintiff breach the contract of February 11, 1958, with the defendant? ANSWER: Yes. 2. If so, in what amount, if any, was the defendant damaged by the plaintiff's breach of the contract of February 11, 1958? ANSWER: $847.00. 3. What amount, if any, is the plaintiff entitled to recover of the defendant on the contract of February 11, 1958? ANSWER: $6,253.00."

The judgment, after quoting said issues and answers, recites that "the plaintiff has elected to remit the sum of three (3.00) dollars from the amount awarded by the jury to make the jury's award conform to the

evidence." The court then ordered, adjudged and decreed that plaintiff have and recover of defendant the sum of $6,250.00 with interest thereon from March 7, 1959, and that the costs of the action be taxed against defendant. Defendant excepted and appealed.

*Broaddus, Epperly & Broaddus and Bryant, Lipton, Bryant & Battle for plaintiff appellee.*
*Manning, Fulton, Skinner & Hunter for defendant appellant.*

BOBBITT, J.  Plaintiff's Exhibit No. 2, a blueprint of the "Trussed Rafter Detail," shows a completely assembled truss. On said blueprint, under the, heading, "Notes," the following appears: "2.  Trussed Rafters: All lumber for rafters to be No. 1, S4S, southern pine with grade mark on each piece. Timber connectors to be 2½" diameter split rings & trip-L-grip framing anchors to be as manufactured by the Timber Engineering Co. Bolts to be ½" machine bolts with 2" x 2" x ⅛" plate or 2⅛" diameter steel washers each end. Timber connectors to be installed according to the manufacturers instructions. Trussed rafters to be closely fitted and accurately fabricated and erected as shown. Bolts thru connectors to be tight. Check & tighten if necessary at time of erection. Provide additional bracing as required for erection."

It seems that trip-L-grip framing anchors were for use in the process of anchoring the trusses to wall plates when installing the trusses in the roofs of the buildings. The lumber, split rings, bolts and washers are referred to in the following general description of a "split ring type 'W' truss" as depicted in the plans and other evidence.

The lumber portion of a truss consisted of a bottom chord (base), two top chords (rafters) and four braces. All chords were made of 2 x 6's. All braces were made of 2 x 4's. Except in a comparatively few instances when it was otherwise specified, the overall length of the bottom chord was 28 feet and 4 inches. Testimony as to the weight of each truss varied from a minimum of 100 to a maximum of 250 pounds.

The top chords extend upward (diagonally) from the ends of the bottim chord, meet at an elevation above the center of the bottom chord and form a triangle of which the bottom chord is the base and the top chords are the sides. From each side of the bottom chord and at an equal distance from the center thereof, a (primary) brace extends upward to the vertex of said (outer) triangle, converging there with the upper ends of the top chords and forming an inner triangle of which the central portion of the bottom chord is the base and these primary braces are the sides. From where the lower end of each primary brace joins the bottom chord a (secondary) brace extends to and joins the top chord on its side of

the outer triangle, forming an inverted triangle of which a portion of the top chord is the base and a primary brace and a secondary brace are the sides. When viewing a completely assembled truss standing upright on the bottom chord, the appearance of the braces resembled the letter "W."

To make the indicated connections, holes were bored as follows: (1) At each end of the bottom chord; (2) at each end of the top chords; (3) at each end of the primary braces; (4) at the lower end of each secondary brace; and (5) in the bottom chord, on each side of the center, where the lower ends of the secondary braces connect with the bottom chord.

Where said holes are bored, two or more pieces of lumber are connected and bolted together in this manner: Between two connecting pieces of lumber there is placed (in a groove made for that purpose) a metal "split ring," having "a split in them so they can open or close up and fit in the holes." A bolt passes through the holes and split rings and is fastened by a nut. In each instance, a washer is placed between the head of the bolt and the (first) piece of lumber on one side and between the nut and the (first) piece of lumber on the opposite side.

The secondary braces are connected with the chords in a different manner: The upper ends of these secondary braces, to which "scabs" are nailed, are connected by nailing the "scabs" to the top chords. A "scab" is "(a) short piece of timber nailed or bolted to two abutting timbers to splice them together." Webster's New International Dictionary, Second Edition.

It seems the bottom chord was composed of two pieces of lumber of equal length, overlapping and bolted together (split rings and bolts being used in the process) so as to constitute one continuous piece of lumber. However, the evidence is unclear as to details.

The trusses were constructed at plaintiff's factory at Martinsville, Virginia, and transported therefrom to the job site in Raleigh on plaintiff's trucks. While certain trusses were rejected by the architect's inspector and replaced as stated below, 2598 trusses constructed by plaintiff were used by defendant and incorporated in the buildings constituting the Walnut Terrace Housing Project. Defendant alleged plaintiff's men at plaintiff's expense "completely assembled 210 of the trusses on the job site." The main controversy is whether the remaining 2388 used by defendant were "completely assembled" within the meaning of the contract upon arrival by truck at the job site in Raleigh.

There is no controversy as to the facts concerning the extent the trusses were assembled when loaded on plaintiff's trucks in Martinsville and upon arrival at the job site in Raleigh. Each truss was "in a folded position similar to closing up a knife." The lower ends of the top

chords and of the braces were connected with the bottom chord by bolts through split rings. These bolts were loose enough to permit the upper portion of the top chords and of the braces to fold over onto the bottom chord. Metal bands were wrapped around each unit to hold the several parts together during shipment.

After unloading and removal of the metal bands, the following work was required to complete the assembly of a truss. The upper ends of the top chords and of the primary braces had to be brought together and connected at the vertex of the outer triangle. Split rings, bolts, nuts and washers for such use were shipped separately (ordinarily on the same truck) and delivered to defendant in boxes or burlap bags. The bolt for use at this location is referred to as "the king pin." Too, the scab on the upper end of each secondary brace had to be brought into position and nailed (four nails) to the upper chord. In addition, the bolts at said connections, four in the bottom chord as well as "the king pin," had to be tightened.

We deem it unnecessary to discuss the conflicting evidence as to the effort and time required to complete at the job site the assembly of a truss. There was evidence for plaintiff tending to show "three *experienced* men could erect one in five minutes." (Our italics). There was evidence for defendant tending to show it took two carpenters and two laborers "a half hour for each truss—that wouldn't miss it two minutes."

There was evidence that only 15 completely assembled trusses, that is, trusses ready for immediate use, could be transported per truckload, but when in "folded" position as many as 75 trusses could be transported per truckload.

"Parties have the legal right to make their own contract, and if the contract is clearly expressed, it must be enforced as it is written." *Barham v. Davenport,* 247 N.C. 575, 578, 101 S.E. 2d 367, and cases cited. And, "where the language of a contract is free from ambiguity, the ascertainment of its meaning and effect is for the court, and not for the jury." *Young v. Mica Co.,* 237 N.C. 644, 648, 75 S.E. 2d 795, and cases cited; *Bishop v. DuBose,* 252 N.C. 158, 161, 113 S.E. 2d 309; *Robbins v. Trading Post,* 253 N.C. 474, 478, 117 S.E. 2d 438.

The contract, in express terms, obligated plaintiff to deliver the trusses to defendant at the job site "completely assembled per plans and specifications." The presumption is that these words "were deliberately chosen and are to be given their ordinary significance." *Briggs v. Mills, Inc.,* 251 N.C. 642, 644, 111 S.E. 2d 841, and cases cited.

The writing in which the terms of the contract are stated is in the form of a letter dated February 11, 1958, from plaintiff (signed by L. P. Fore, District Representative) to defendant. The proposal or offer set

forth in said letter was accepted in behalf of defendant by J. E. Merritt. It is "a rule of construction that an ambiguity in a written contract is to be inclined against the party who prepared the writing. *Wilkie v. Ins. Co.,* 146 N.C. 513, 60 S.E. 427." *Jones v. Realty Co.,* 226 N.C. 303, 305, 37 S.E. 2d 906; *Realty Co. v. Batson,* 256 N.C. 298, 307, 123 S.E. 2d 744; *Trust Co. v. Medford,* 258 N.C. 146, 149, 128 S.E. 2d 141.

In Webster's New International Dictionary, Second Edition, we find this definition of the verb "assemble": "3. To collect and put together the parts of; as, to *assemble* an automobile, airplane, watch, or gun." Too, we find this definition of the verb "complete": "To bring to a state of entirety or perfection; to perfect; to furnish or equip fully; to fulfill; finish, as, to *complete* a task." "Completely" is the adverb of the verb "complete."

When the words used are given their ordinary significance, we think the plain and unambiguous meaning of the quoted contract provision obligated plaintiff to deliver the trusses to defendant at the job site in Raleigh in such condition that they conformed to the plans and specifications and were suitable for immediate use without further action with reference to assembling the parts thereof. The contract provision relates solely to the condition of the trusses when delivered by plaintiff to defendant at the job site. Whether the trusses were to be completely assembled at Martinsville or assembled in part at Martinsville and in part at the job site was for decision according to plaintiff's preference.

"The necessity in pleading of the making of specific averments of usages and customs is ordinarily dependent upon the nature of the particular usage or custom in question, whether it is a general one of which the court takes judicial notice—a matter which in its final analysis is one of evidence and not of pleading—or is one local in character or one which pertains to a particular trade or business." 55 Am. Jur., Usages and Customs § 46; 25 C.J.S., Customs and Usages § 32. There is a serious question as to whether the *negative* averments in plaintiff's reply, quoted in our preliminary statement, constitute a sufficient allegation that the phrase "completely assembled" has a generally known or accepted meaning in the building trades. It is noted that plaintiff did not allege what it contended was such generally known and accepted meaning. Be that as it may, we think the evidence offered by plaintiff was erroneously admitted *and* was insufficient to support plaintiff's contention.

All the evidence is to the effect the 2388 trusses were not completely assembled when they arrived at the job site in Raleigh and that the assembly of these trusses was completed by defendant.

"Perhaps the most fundamental of the rules which limit the introduction of a custom or usage to affect the rights of parties to a written con-

tract is that which denies the admissibility of such evidence where its purpose or effect is to contradict the plain, unambiguous terms, covenants, and agreements expressed in the contract itself, or to vary or qualify terms which are free from ambiguity, even though the provisions of the contract may be unusual. A custom or usage may be proved in explanation and qualification of the terms of a contract which otherwise would be ambiguous, or to show that the words in which the contract is expressed are used in a particular sense different from that which they usually import, and, in some cases, to annex incidents to the contract in matters upon which it is silent; but evidence of a usage or custom is never admitted to make a new contract or to add a new element to one previously made. It may explain what is ambiguous but it cannot vary or contradict what is manifest and plain, or be received to give to plain and unambiguous words or phrases a meaning different from their natural import." 55 Am. Jur., Usages and Customs § 31; 25 C.J.S., Customs and Usages § 30. In this connection, see *Cooper v. Purvis*, 46 N.C. 141.

The distinction may be illustrated by a comparison of the present case with *Long v. Davidson*, 101 N.C. 170, 7 S.E. 758. In *Long*, the plaintiff testified the defendant agreed to pay $2.40 per thousand for laying brick, the number to be estimated by "wall count, solid measure." Evidence that the quoted words had an established meaning, universally understood among brickmasons and contractors, was held competent as explanatory of (otherwise) ambiguous terms of the contract. In the present case, plaintiff offered no evidence tending to show the words "completely assembled per plans and specifications F.O.B. job site," which are plain and unambiguous, had a meaning in the building trades different from their ordinary significance.

*McDearman v. Morris*, 183 N.C. 76, 110 S.E. 642, and *R. R. v. Fertilizer Co.*, 188 N.C. 137, 124 S.E. 127, cited by plaintiff, are readily distinguishable. Suffice to say, there was no attempt to show a custom or usage to contradict or to explain any term of an express contract.

Defendant assigns as error the admission over its objection of incompetent evidence. This evidence relates to customary methods in which such trusses are *shipped*. It includes testimony that such trusses are shipped "whole folded," "folded in halves" or "knocked down." It includes testimony that such trusses when "whole folded" are in a position known in the trade as "assembled *for shipment*." It includes the testimony of one witness that the particular trusses involved in the present case *were shipped* "as called for in the plans and specifications."

A pamphlet entitled "Fabricating Instructions for TECO Roof Trusses (Split Ring Type)," was admitted in evidence over defendant's objec-

tion. We pass, without discussion, defendant's contention that this pamphlet was not sufficiently identified. The pamphlet indicates it was issued by Timber Engineering Company of Washington, D. C., San Francisco and Los Angeles. Defendant objected particularly to that portion of the pamphlet which, under the heading "SHIPPING," provides: "The TECO ring type truss can be shipped a variety of ways for maximum savings in shipping space. The following are three suggested methods of shipment: FOLDED (illustrated) saving in space 36%, IN HALVES (illustrated) saving in space 55%, KNOCKED DOWN (illustrated) saving in space 81%."

The said testimony, similar testimony and the portion of said pamphlet under the heading, "SHIPPING," was incompetent and should have been excluded. It relates solely to methods by which *partially assembled trusses* may be shipped. No matter how shipped, performance of the contract required that plaintiff deliver "completely assembled" trusses at the job site.

Plaintiff contends the admission of such evidence, even if held incompetent, was harmless. This contention is based on the fact the jury answered the first issue, "Yes," and thereby found that plaintiff had breached the contract.

It is well settled that a verdict must be interpreted with reference to the pleadings, the evidence and the judge's charge. *Widenhouse v. Yow,* 258 N.C. 599, 605, 129 S.E. 2d 306, and cases cited.

The court's instructions bearing upon the first issue include the following: "The question for you is what is meant by the words 'completely assembled' and in that connection the plaintiff says and contends that there exists in the building trade a custom, a trade custom, which provides that the trusses should be shipped bundled up and knocked down, that that assembly is recognized by the custom of the building trade, that all of these trusses were assembled in accordance with that custom and that the execution of the contract incorporated within its provisions the recognized custom in force in the trade at the time, and I instruct you, Members of the Jury, that if you find that was the general trade custom in force at the time that the trusses were shipped and assembled in the manner required by that custom and it did enter into and was a part of the contract, and if you find that they were shipped in accordance with that custom your answer to that issue would be 'no'; that would constitute compliance with the contract at the time delivery was made, in other words. Instructions will hereafter be given you touching on the law of breach of contract with reference to existing trade customs unless those trade customs are expressly excluded by the agreement, and there was no exclusion in this agreement, gentlemen. So I instruct you if you

find by the greater weight of the evidence there was the general well established rule of custom and usage in the trade when these trusses were shipped that they were assembled by putting or fastening them together with a band around the center of them for the purpose of shipping and that this custom was known to the parties then that would constitute, as far as the assembly is concerned, a lawful assembly of the trusses; and if you further find by the greater weight of the evidence that the trusses were delivered to the site and that they were made suitable for the purpose for which they were purchased, you would answer that first issue 'no.' The burden of establishing that issue is upon the defendant, the Thompson Company, to establish it by the greater weight of the evidence." Defendant excepted.

All the evidence was to the effect the 2388 trusses were "folded," with two metal bands around each truss, when delivered by plaintiff to defendant at the job site in Raleigh. There being no controversy as to the terms of the contract, whether the said "folded" trusses were "completely assembled" was for decision by the court, not by the jury. They were not "completely assembled" and defendant was entitled to an explicit instruction to that effect. For reasons indicated above, the instructions relating to trade customs were inappropriate and tended to confuse rather than clarify the issue.

Defendant's allegations and evidence are to the effect plaintiff breached its contract in two separate and distinct ways: (1) by plaintiff's failure to deliver the 2388 trusses "completely assembled," and (2) by its delivery of trusses which in other respects did not comply with the plans and specifications. Defendant offered evidence tending to show the expenses it incurred in completing the assembly of the 2388 trusses. Defendant offered other evidence tending to show that it incurred additional expense in making corrections sufficient to put in usable condition trusses that did not (apart from the fact they were not completely assembled) comply with the plans and specifications. The first issue involved whether plaintiff had breached its contract in either of these respects.

Careful examination of the charge discloses no instruction as to the circumstances under which the jury would answer the first issue, "Yes." Indeed, the word, "Yes," does not appear anywhere in the charge.

"Under G.S. 1-180, the trial judge is required to relate and apply the law to the variant factual situations having support in the evidence. (Citations). He has '. . . the positive duty of instructing the jury as to the law upon all of the substantial features of the case.' (Citations). Moreover, in the absence of request for special instructions, a failure to charge the law on the substantial features of the case arising on the evidence is prejudicial error. (Citations)." *Westmoreland v. Gregory*, 255

N.C. 172, 177, 120 S.E. 2d 523; *Pittman v. Swanson*, 255 N.C. 681, 685, 122 S.E. 2d 814.

. Under the circumstances, it cannot be determined in what way the jury, by its answer to the first issue, found plaintiff had breached its contract with defendant. The conclusion reached is that the jury's answer to the first issue, when considered in connection with the court's instructions in relation thereto, is insufficient to render harmless the admission of the incompetent and prejudicial evidence.

Moreover, we are of opinion, and so decide, that the court erred in granting plaintiff's motion for nonsuit of defendant's counterclaim. All the evidence tended to show the trusses in the first shipment were too short, were returned to plaintiff's factory and were replaced by other trusses. Evidence offered by defendant tended to show that, with knowledge as to when these trusses were to arrive, it had lined up its crew to handle them; that it was found these trusses were too short when its crew was engaged in putting them on a building; that, because the trusses were short and had to be taken down, it was five hours before defendant could get its crew back to work on some other job; that its crew consisted of nine carpenters, two apprentices, four laborers and a crane operator; and that the "total cost of the men and the crane for five hours was $222.10." In our view, this evidence alone, when considered in the light most favorable to defendant, was sufficient to withstand plaintiff's motion for nonsuit of defendant's counterclaim.

Although not stressed by either party, it seems appropriate to mention the matters narrated below.

Two payments were made by defendant to plaintiff, $1,812.20 on September 11, 1958, and $23,090.00 on January 23, 1959. Defendant's superintendent testified: "By the end of December, 1958, there were 28 buildings complete with trusses. That left 10 buildings for trusses to be put in after that." Defendant offered evidence tending to show: Upon arrival of the first load of trusses, defendant's president (Hal A. Thompson) got in touch with plaintiff's Mr. Fore. Mr. Fore came to the job site in Raleigh. According to Thompson: "I told him and he agreed that the trusses were knocked down, that is to say, not assembled, and said, 'Well, you will just have to put them together, use your carpenters and keep time on us and we will pay you for them,' and that's exactly what we did." Thereafter, defendant by letter dated September 18, 1958, signed by Thompson, referring to the Walnut Terrace Housing Project, advised plaintiff as follows: "We thought it advisable to go on record in the matter of the trusses being delivered to the above mentioned job. As you know, our men are having to assemble these trusses on the job. You will be back charged for the labor involved in this operation since you orig-

inally quoted us F.O.B. job site completely assembled." This letter, addressed to plaintiff, invited particularly the attention of L. P. Fore, the person who had signed in plaintiff's behalf the contract of February 11, 1958. It is noted that Mr. Fore was not a witness and there was no explanation of his failure to testify.

For the reasons indicated, the ruling granting plaintiff's motion for nonsuit of defendant's counterclaim is reversed; and, for the indicated errors, the entire cause is remanded for a new trial not inconsistent with the law as stated in this opinion.

New trial.