STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF
JUSTICE
SUPERIOR COURT DIVISION
98 CVS 12661

NOVANT HEALTH, INC.,
PRESBYTERIAN REGIONAL
HEALTHCARE CORP., THE
PRESBYTERIAN HOSPITAL, and
PRESBYTERIAN HEALTH
NETWORK, INC.,

Plaintiffs,

v.

AETNA U.S. HEALTHCARE OF
THE CAROLINAS, INC.,

Defendant.

ORDER and OPINION

{1}     THIS MATTER comes before the Court on the motion for partial summary judgment on the issue of Defendant Aetna U.S. Healthcare of the Carolinas, Inc.'s ("Aetna-USH") liability for breach of contract, such motion having been filed by Plaintiffs Novant Health, Inc., Presbyterian Regional HealthCare Corp., the Presbyterian Hospital, and Presbyterian Health Network, Inc. (collectively, "Presbyterian"). For the reasons set forth below, Presbyterian's motion for partial summary judgment is granted.

{2}

*Kilpatrick Stockton L.L.P., by Denise M. Gunter, Noah H. Huffstetler, III and Raboteau T. Wilder, Jr., for Plaintiffs Novant Health, Inc., Presbyterian Regional HealthCare Corp., The Presbyterian Hospital and Presbyterian Health Network, Inc.*

*Smith Helms Mulliss & Moore, L.L.P., by T. Jonathan Adams and Thomas W. Murrell, III, for Defendant Aetna U.S. Healthcare of the Carolinas, Inc.*

**I.**

{3}     This is a breach of contract action involving cancellation of four agreements between Presbyterian and U.S. Healthcare of the Carolinas, Inc. ("USH"), Aetna-USH's predecessor in interest. The four contracts between Presbyterian and USH include the "Managed Care Agreement," two "Primary Network" agreements, and a "Specialty Network Agreement." The agreements became effective in 1995, and Presbyterian and its network physicians began providing services to members pursuant to

the agreements.

{4}    Combined, the agreements provide an integrated health maintenance organization ("HMO") insurance product to individuals receiving benefits from USH ("Members").

{5}    In 1996 USH and Aetna Life & Casualty merged to form Aetna-USH. At the time of the merger Aetna had three times as many members as USH and had an existing contract with Carolinas HealthCare System ("CHS").

{6}    In August 1998, Aetna-USH and CHS issued a joint press release, which announced that Aetna-USH's contract with Presbyterian would terminate, that Members with physicians chosen through the Presbyterian network would be required to choose new primary care physicians by January 1, 1999, and that CHS would soon be the exclusive provider of hospital services for Aetna-USH.

{7}    In letters dated August 26, 1998, Aetna-USH terminated all four agreements with Presbyterian. In its termination letter, Aetna-USH indicated that it was terminating three of the agreements – the Managed Care Agreement and both Primary Network agreements – "pursuant to section 12.A" of the respective agreements; it cancelled the Specialty Network Agreement pursuant to section 8.A of that agreement. Aetna-USH did not identify in its letters of termination any other cause for termination other than the provisions identified above.

{8}    Section 12 of the Managed Care Agreement provides:

> 12. Term Of Agreement
>
> A. This Agreement shall be effective for five (5) years from [effective date] and thereafter shall be renewed for an additional five (5) years unless terminated by either party . . . at least one-hundred eighty days prior to such date.
>
> B. This agreement may be terminated at any time by either party by thirty (30) days prior written notice of such termination to the other party upon default or breach by such party of one or more of its obligations hereunder unless such default or breach is cured within thirty (30) days of the notice of termination.

Both Primary Network agreements contain identical provisions for terminating the contract. Section 8 of the Specialty Network Agreement is identical in content to sections 12 of the other three agreements. The relevant clauses of Sections 12 and 8 state:

> 12. Termination  [8. Term]
>
> A. This Agreement shall be effective for five (5) years from [effective date] and thereafter shall be renewed for an additional five (5) years unless terminated by either party . . . at least one hundred eighty days prior to the end of the initial term.
>
> B. This agreement may be terminated at any time by either party by thirty (30) days prior written notice of such termination to the other party upon default or breach by such party of one or more of its obligations hereunder unless such default or breach is cured within thirty (30) days of the notice of termination.

The only difference between the Managed Care Agreement and the other three agreements is the language

referring to "such date" at the end of Section 12.A, instead of "end of initial term" as in the other three agreements. Section 12.C. provides a list of circumstances for which the agreements may be immediately terminated (i.e., expiration of licensure, bankruptcy, debarment, etc.), all of which require some degree of fault.

{9}     On August 28, 1998, Presbyterian issued a letter demanding that Aetna-USH honor the five-year term of the agreements. Aetna-USH refused and Presbyterian filed this lawsuit.

{10}    The motion for partial summary judgment requires the court to interpret the language of the contract.

## II

{11}    Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law. *See* N.C. R. Civ. P. 56(c); *see also Beam v. Kerlee*, 120 N.C. App. 203, 209, 461 S.E.2d 911, 916 (1995) (recognizing that summary judgment is appropriate only when "there is no dispute as to any material fact"). As moving parties, defendants have "the burden of showing there is no triable issue of material fact." *Farrelly v. Hamilton Square*, 119 N.C. App. 541, 543, 459 S.E.2d 23, 25-26; *see also Taylor v. Ashburn*, 112 N.C. App. 604, 606, 436 S.E.2d 276, 278 (1993). In determining whether that burden has been met, the court "must view all the evidence in the light most favorable to the non-moving party, accepting all its asserted facts as true, and drawing all reasonable inferences in its favor." *Lilley v. Blue Ridge Elec. Membership Corp.*, 133 N.C. App. 256, 258, 515 S.E.2d 483, 485 (1999); *see also Murray v. Nationwide Mut. Ins. Co.,* 123 N.C. App. 1, 472 S.E.2d 358, 362 (1996).

{12}    To grant summary judgment, the court must conclude that no reasonable jury could find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When considering a motion for summary judgment, the judge must determine whether a fair-minded jury could return a verdict for the non-movant on the evidence presented. *See Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 U.S. App. LEXIS 21487, at *10 (4th Cir. Sept. 7, 1999) (quoting *Anderson*, 477 U.S. at 252).

{13}    When parties use clear and unambiguous terms, the court as a matter of law can interpret the contract. *Mountain Fed. Land Bank v. First Union Nat'l Bank*, 98 N.C. App. 195, 200, 390 S.E.2d

679, 682, *disc. rev. denied*, 327 N.C. 141, 394 S.E.2d 178 (1990). While the intent of the parties is at the heart of a contract, intent is a question of law where the writing is unambiguous. *Lane v. Scarborough*, 284 N.C. 407, 200 S.E.2d 622 (1973). For the reasons set forth below the Court finds sections 12.A and 8.A, as referenced above, unambiguous.

{14} Presbyterian argues that the plain meaning of the terms used in Section 12 is subject to only one reasonable interpretation: "the only time the contract could be cancelled without cause was on the initial fifth year anniversary, and in order for that to happen, the party desiring cancellation had to provide the other party with at least one hundred and eighty days' prior written notice." (Pl. Br. Supp. Summ. J. at 7.)

{15} The automatic renewal provision, Presbyterian argues, is the only part of the section modified by the "unless" clause. Presbyterian, relying on Blacks' Law Dictionary (7th ed. 1999), further contends that "such date" in Section 12.A of the Managed Care Agreement could only mean the date having just been mentioned: "five (5) years from" the effective date. (Pl. Br. Supp. Summ. J. at 10.)

{16} Presbyterian also contends that the structure of Section 12 supports the view that 12.A does not allow for termination without cause. Section 12 contains four sections. Section 12.A, according to Presbyterian, contains the term of the agreement, whereas Sections 12.B-C provide exclusively for termination. Presbyterian contends that a without-cause termination provision would necessarily be included in Section 12.B.

{17} On the other hand, Aetna-USH asserts that Section 12.A of the agreement contains "one independent clause (with two predicates) followed by a dependent clause." (Def. Br. Opp'n Summ. J. at 13). Aetna-USH brings the Court's attention to the lack of comma before "and thereafter." Citing a number of grammar and writing references, Aetna-USH argues that, because of the lack of comma, the phrase "unless terminated" begins a restrictive modifier/clause that modifies both initial term of the contract and the renewal. *See, e.g.,* H. Ramsey Fowler, *The Little, Brown Handbook,* p. 528 (1980); William Strunk Jr. and E.B. White, *The Elements of Style,* 3d ed. P. 4 (1979); Lynn Quitmena Troyka, *Simon & Schuster Handbook for Writers*, p. 322 (1987). Aetna-USH also counters that the most reasonable meaning of "such date" in Section 12.A "is the termination date specified in the termination notice. Such date is the date on which termination will be effective. It is the date 180 days hence when termination is effective as specified in the notice." (Def. Br. Opp'n Summ. J. at 16.)

{18} Aetna-USH counters Presbyterian's argument on the structure of Section 12 by stating that Section 12 contains three types of termination provisions, each with differing levels of notice and causation. Section 12A, a without-cause provision, demands the long notice of six months. Section 12.B, a for-

cause provision, requires only thirty days' notice. Finally, Section 12.C, another for-cause provision for addressing more serious transgressions, gives Aetna-USH the opportunity to terminate the Agreement immediately. Aetna-USH contends that this structure is the most reasonable reading of Section 12.

{19} With respect to the Primary Network and Specialty Network agreements, Presbyterian again argues that the plain meaning of the terms used in Section 12 is subject to only one reasonable interpretation: the term of the agreement was for an initial five years; the agreement could be terminated only for cause; and, with 180 days' notice, either party could prevent the renewal of the contract at the end of the initial five years. Presbyterian further maintains that the reference to the "end of the initial term" in the two Primary Network agreements and the Specialty Network Agreement could only "mean that the notice-of-termination provision is triggered by renewal." (Pl. Br. Supp. Summ. J. at 8.) Thus, "unless" a notice is received by one hundred and eighty days before the expiration of the initial five-year term, the contract is automatically renewed.

{20} Conversely, Aetna-USH posits that the significance of the "end of the initial term" phrase simply means that Aetna-USH was barred from terminating the agreement during the last six months of the initial five-year term but could terminate the agreements on six months notice at any other time. That interpretation is illogical and strained as indicated below. It also requires a different interpretation from the Managed Care Agreement.

{21} Presbyterian and Aetna-USH present the same arguments regarding the structure of Sections 12 and 8 of the Primary Network and the Specialty Network agreements, respectively, as was made for the structure of the Managed Care Agreement.

{22} This Court does not find Aetna-USH's reliance on grammar and punctuation persuasive. The courts have long used rules governing grammar as an aid to interpreting statutes, contracts and other written instruments. *See State v. Jernigan* 7 N.C. (3 Mur. 12) (1819); *HCA Crossroads Residential Ctrs. v. N.C. Dep't of Human Res.,* 327 N.C. 573, 398 S.E.2d 466 (1990). For example, the North Carolina Supreme Court stated as early as 1819 the following general rule for the application of antecedent clauses such as the clause at issue in this case:

> The rule of grammar that words shall be referred to the next antecedent, has been adopted and enforced in the law from an early period, and has had a direct influence upon the decision of many cases. But much to the credit of the Sages of the law, it has uniformly been received and practised [sic] upon, with its proper limit and qualification, so as to fulfill the intention of the Legislature in civil matters, to ascertain the design of parties in private contracts, and to furnish a rational exposition of every instrument, public and private that called for the judgment of a court.

*Jernigan,* 7 N.C. 11 (3 Mur. 12) (1819). More recently the Court reiterated this rule.

> By what is known as the doctrine of the last antecedent, relative and qualifying words, phrases, and clauses ordinarily are to be applied to the word or phrase immediately preceding and, unless the context indicates a contrary intent, are not to be construed as extending to or including others more remote. [citations omitted]

*HCA Crossroads Residential Ctrs. v. N.C. Dep't of Human Res.,* 327 N.C. 573, 578, 398 S.E.2d 466, 469 (1990). While this rule is favorable to this Court's ruling, both of these iterations of the general rule as it is applied to antecedents contain cautionary language emphasizing the need to construe the language consistently with the intent of the parties and in context with the entire contract regardless of the rules of grammar. *Id.* In essence, the doctrine of the last antecedent only applies if it is logical to apply it. Consequently, the Court does not rely solely on the doctrine of the last antecedent for its ruling, although it is logical to apply it here.

{23}    The Court additionally relies on two basic rules of contract construction: (1) "that a contract must be construed as a whole, considering each clause and word with reference to other provisions and giving effect to each whenever possible. . . ." and (2) "the common or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to it." *Marcoin, Inc. v. McDaniel*, 70 N.C. App. 498, 504, 320 S.E.2d 892, 897 (1984), *disc. rev. denied*, 312 N.C. 797, 325 S.E.2d 631 (1985) (citations omitted).

{24}    The Court has received the contracts as a whole and also considered the fact that the contracts were designed to operate together. The use of the language "prior to the end of the initial term" in the Primary Network and Special Network agreements is a clear indication that "such date" in Section 12.A of the Managed Care Agreement refers to the date at the end of the first five-year term. It is equally clear from the contract language that the contracts were to run for an initial five-year term and would renew for an additional five years unless notice was sent at least one hundred and eighty days prior to the end of the initial term. That is the common and normal meaning of the language used in the contracts and there exists no basis for giving those words any different or special meaning.

{25}    Aetna-USH's interpretation causes at least two anomalous results to occur. First, to apply its argument would not give effect to all of the words in the provisions. For example, all four contracts make reference to a five-year period. It is illogical that the parties would make explicit reference to a five-year period if the parties believe the agreements to be terminable at-will with six months' notice. The language specifying the five-year terms does not alter the meaning of the clauses as interpreted by Aetna-USH, but has central significance as construed by Presbyterian. The same argument applies to the phrase "initial term." "The word 'term' means a 'fixed and definite period of time.'" *First Citizens*

*Bank & Trust Co. v. Conway Nat'l Bank,* 282 S.C. 303,306, 317 S.E.2d 776, 778 (1984) (quoting *State ex rel. Rushford v. Meador*, 267 S.E. (2d) 169, 170 (W. Va. 1980)). It "implies a period of time with some definite termination." *First Citizens Bank & Trust Co. v. Conway Nat'l Bank,* 282 S.C. 303, 306, 317 S.E.2d 776, 778 (1984) (quoting *Rooney v. City of Omaha*, 105 Neb. 447, 181 N.W. 143, 144 (1920)). Likewise, the common meaning of "initial" is "that which begins or stands at the beginning." *Blacks Law Dictionary* 783 (6th ed. 1990). Combined, the phrase "initial term" means the first period of fixed time in a series of fixed time periods. Aetna-USH's theory completely eviscerates this meaning by failing to attach any significance to the phrase and by giving the six-month notice provision a meaning contrary to the meaning of "initial term." Hence, Aetna-USH's reading creates an inconsistency not found under a simple reading of the clause.

{26}   Second, to uphold Aetna-USH's argument with regard to the Primary Network and Specialty Network agreements — that Aetna-USH was only barred from terminating those agreements during the last six months of the initial period — would also require the Court to support the following sequence of events: if Aetna-USH wanted to terminate the contract at the end of the first five years but failed to terminate six months before the five-year anniversary date, then Aetna-USH would be required to wait to give its notice of termination until after the second five-year term began. As a result of Aetna-USH's reading of the provision, the last six months of the first five years are treated differently that any other time during the potential ten-year agreement. Under both parties' theories if either party fails to provide timely notice in the last six months of the first five years the automatic renewal provision is triggered[FN1]. Thus, if Aetna-USH gave notice of termination during the last month of the first five-year term, the failure of timely notice would trigger the automatic renewal provision and the contract would automatically renew. Subsequently, on the first day following the five-year anniversary date, Aetna-USH's notice of termination might become effective. Further, if Aetna-USH provided notice of termination on the last month of the new period, the contract would continue for seven additional months: the one month remaining in the initial term plus six months in the new term. There is no logical explanation as to why the last six months of the first five years of the agreement required such special treatment.

{27}   Further, Aetna-USH's interpretation that a restriction exists on the last six months of the first five years of the Primary Network and Specialty Network agreements is inconsistent with its theory with regard to the reference to "such date" in the Managed Care Agreement. As the Court noted above, these agreements formed the basis of a comprehensive HMO, which by necessity requires the contracts to operate under the same restrictions and terms. However, Aetna-USH argued that "such

date" as it is referred to in the Managed Care Agreement is the termination date specified in the termination notice: "Such date is the date on which termination will be effective. It is the date 180 days hence when termination is effective as specified in the notice." (Def. Br. Opp'n Summ. J. at 16.) Hence, according to Aetna-USH's theory, the Managed Care Agreement could be terminated at any time during the first five years of the agreement with 180 days' notice counting backwards from the date identified in the termination notice, upon which termination date all services would cease. The disparate treatment of termination rights does not make sense and results from Aetna-USH's attempt to deal with the "end of the initial term" language in the three network agreements.

{28}    Aetna-USH insists that parol evidence is necessary to ascertain the true intent of the parties. It submitted the affidavit of William Dixey in support of its contention that the parties intended an agreement which would include both without-cause and six-month notice of termination provisions. Mr. Dixey, a primary drafter of the agreement, states that he intended for the agreement to be terminable without cause. His sole method of communicating his intent was to remove from drafts of the agreements a sentence that more clearly stated that the agreements were not terminable within the first five years. He is unable to state that he ever discussed this removal with representatives from Presbyterian. This affidavit does not prevent entry of summary judgment on the agreements at issue for two reasons. First, the language of the agreement is plain and clear on its face and intent is a question of law as evidenced by the unambiguous terms. *Lane v. Scarborough*, 284 N.C. 407, 200 S.E.2d 622 (1973). Second, Mr. Dixey's affidavit only voices his subjective intent. "It is not the understanding or intent of one of the parties that controls the interpretation of a contract, but the agreement of both parties." *Vestal v. Vestal,* 49 N.C. App. 263, 268, 271 S.E.2d 306, 310 (1980) (quoting *Lumber Co. v. Lumber Co.*, 137 N.C. 431, 436, 49 S.E. 946, 948 (1905); *Rhoades v. Rhoades,* 44 N.C. App. 43, 45, 260 S.E.2d 151, 153 (1979)). Also supporting the Court's decision is the fact that the document in dispute was prepared by Aetna-USH. "It is a rule of contracts that in case of disputed items, the interpretation of the contract will be inclined against the person who drafted it." *Contracting Co. v. Ports Authority*, 284 N.C. 732, 738, 202 S.E.2d 473, 476 (1974) (quoting *Yates v. Brown*, 275 N.C. 634, 170 S.E. 2d 477 (1969); *Root v. Insurance Co.*, 272 N.C. 580, 158 S.E.2d 829 (1968); *Lester Bros., Inc. v. Thompson Co.*, 261 N.C. 210, 134 S.E.2d 372 (1964); *Trust Co. v. Medford*, 258 N.C. 146, 128 S.E.2d 141 (1962)). These are sophisticated companies; if the parties had intended to create a termination-without-cause provision, undoubtedly they would have succeeded.

{29}   "Parties can differ as to the interpretation of language without its being ambiguous," and this Court finds no ambiguity here. *Walton v. City of Raleigh,* 342 N.C. 879, 881-882, 467 S.E.2d 410*, 412 (1996). The most natural reading of the sections at issue creates no inconsistency, no puzzling results, and gives effects to all terms of the clauses; thus the intent of the parties can be decided as a matter of law. *See Lane v. Scarborough*, 284 N.C. 407, 200 S.E.2d 622 (1973). Here, the intent of the parties was to create a five-year agreement that would automatically renew unless the parties terminated the contract at least six months before the end of the first five-year term.

{30}   Therefore it is hereby ordered, adjudged and decreed that Presbyterian's motion for partial summary judgment is granted.

This is the 8th day of March 2001.

> Ben F. Tennille
> Special Superior Court Judge
> for Complex Business Cases

---

[FN1] Since there is no fixed term to renew, the automatic renewal provision is yet another example of contract language rendered ineffective under Aetna's theory of interpretation.